

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SDD:DCP
F. #2014R01395

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 13, 2016

<u>By Hand and ECF</u>

The Honorable Eric N. Vitaliano
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

      Re:    United States v. Amged Kamel Yonan Tawdraus
               <u>Criminal Docket No. 13-612 (S-1) (ENV)</u>

Dear Judge Vitaliano:

      On April, 1 2015, the defendant Amged Kamel Yonan Tawdraus (the "defendant" or "Tawdraus") pleaded guilty before Your Honor to Count Two of a two-count superseding information.  Count Two charged the defendant with knowingly failing to file accurate export information through the Automated Export System with respect to the attempted international shipment of munitions from the United States to Egypt, in violation of 13 U.S.C. § 305(a)(1).  The defendant is scheduled to be sentenced on May 2, 2016.  For the reasons stated below the government respectfully requests that the Court impose a sentence of incarceration, and does not oppose a modest downward adjustment below the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") sentence of 37 to 46 months' imprisonment.

1

I.   Applicable Export Regulations

This case involves the application of two very important regulatory schemes, both of which are intended to help the U.S. government monitor and control the shipment of goods in international commerce, some of which pose a potential national security threat.

A.   Arms Export Control Act

At all times relevant to this case, the export of defense related articles was regulated by the Arms Export Control Act, Title 22, United States Code, Section 2778 ("AECA"). Section 2778(a) authorized the President of the United States to control the import and export of defense articles and to establish a United States Munitions List (the "USML"), which designated and defined the defense articles subject to these controls. Section 2778(b) required any person engaged in the business of manufacturing or exporting any defense articles to register with the government. Section 2778(c) established criminal penalties for any willful violation of Section 2778 or any rule or regulation promulgated thereunder.

The United States Department of State (the "State Department") implemented these statutory provisions by adopting the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120 et seq. These regulations established the USML and required an export license for the export of any items on the list. Specifically, Part 123.1 of Title 22 of the Code of Federal Regulations provided that "Any person who intends to export . . . a defense article must obtain the approval of the Directorate of Defense Trade Controls prior to the export or temporary import, unless the export or temporary import qualifies for an exemption under the provisions of this subchapter." In addition, Part 127.1 of Title 22 of the Code of Federal Regulations provided that "It is unlawful [t]o export or attempt to export from the United States . . . any defense article . . . for which a license or written approval is required . . . without first obtaining the required license or written approval from the Directorate of Defense Trade Controls."

B.   Foreign Trade Regulations

The Secretary of Commerce had the authority to collect information from persons exporting goods from the United States. 13 U.S.C. §§ 301, et seq. The Foreign Trade Regulations ("FTR") authorized the Secretary of Commerce, with the concurrence of the Secretary of State and the Secretary of Homeland Security, to publish regulations mandating that all persons engaged in the export of commodities file information regarding exports via the Automated Export System ("AES") for all shipments where a Shipper's Export Declaration ("SED") was previously required. 15 C.F.R. § 30.1. AES is the electronic system for collecting information from persons exporting goods from the United States. The FTR declared that electronic filing through the AES strengthens the U.S. government's ability to prevent the export of certain items to unauthorized destinations and/or end users because the AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b).

In addition, with respect to commodities shipped under a single commodity designation code with a value of more than $2,500, or any shipment for which an export license is required, regardless of value, the FTR provided that Electronic Export Information ("EEI") shall be filed through the AES by the United States Principal Party In Interest ("USPPI"), the USPPI's authorized agent (such as a freight forwarder), or the authorized U.S. agent of the Foreign Principal Party In Interest ("FPPI") for all exports of physical goods, including shipments transported pursuant to orders received over the Internet. 15 C.F.R. §§ 30.2(a)(1), 30.37(a).

The USPPI or its authorized agent had the responsibility to submit complete, correct information in AES based on personal knowledge of the facts or on information furnished by the parties to the export transaction. 15 C.F.R. §§ 30.3, 30.9. Information that must be submitted in AES included, among other things, an accurate statement as to the contents of the shipment. 15 C.F.R. § 30.6.

II.   Offense Conduct

  A.   Background

The defendant's criminal conduct in this case stems from his involvement in a conspiracy to export defense articles on the United States Munitions List from the United States to Egypt without a license. The defendant was a Partner and Sales and Marketing Director of AMA United Group. (PSR ¶ 5). AMA United Group was a corporation based in Cairo, Egypt that was in the business of supplying precision tools, machine tools, and various specialty materials to the military industry as well as to the automotive and aerospace industries. (Id. ¶ 4).

  B.   AMA United's Initial Efforts to Procure Defense Items

On February 17, 2011, Amir Astafanos, a Partner and Technical Director of AMA United, contacted an undercover agent from the Department of Homeland Security, Homeland Security Investigations ("UC-1") via email on behalf of AMA United Group with a request for quote for 1,000,000 bomblet bodies with rivets[1] and 1,000,000 trumpet liners.[2] (PSR ¶ 14). AMA United found UC-1's contact information on the internet, and believed him to be a broker and distributor of various controlled technologies. On February 23, 2011, UC-1 and Astafanos communicated via Skype, an online video application. Astafanos stated that AMA United Group procured military components and stressed that the order of

---

[1] A bomblet is a type of submunition defined as "one of a number of small bombs usually contained in a cluster bomb and released in mid-air." A bomblet body is a metal casing or shell used in the production of bomblets, which, standing alone, does not contain the explosive materials or fuse used to detonate bomblets. (PSR ¶ 3).

[2] A trumpet liner is a conical shaped object that fits inside a bomblet and is used to focus the direction of a blast wave and increase penetrability, specifically, to increase the bomblet's armor-piercing capabilities. (PSR ¶ 4).

1,000,000 bomblet bodies and 1,000,000 trumpet liners was very important to the company. UC-1 acknowledged that he might be able to obtain such items, but informed Astafanos that the United States government requires a license for the exportation of military items to Egypt. Astafanos confirmed that he understood the requirement. (Id.)

After additional online discussions, on May 18, 2011, Astafanos sent UC-1 an email requesting that bomblet samples be sent to Egypt within ten days. The same day, UC-1 replied stating that he could not send the samples because they were too sensitive to be sent by courier and a license was needed to export them. Later the same day, Astafanos responded that UC-1 should "send the samples by courier and don't refer to it as a military parts but a normal samples, so you can't need in this case to the license export." (PSR ¶ 15-16).

On May 27, 2011, UC-1 sent Astafanos an email stating that he could not send the sample to Egypt for the reasons previously discussed. On May 28, 2011, Astafanos sent UC-1 an email containing alternate options to have the samples sent to Egypt, including using an Egypt Air pilot or giving the samples to an unnamed employee of AMA United Group who were in the United States or could travel to the United States. (PSR ¶ 17). On June 2, 2011, Astafanos informed UC-1 that he had given the Egypt Air pilot contact information for UC-1. UC-1 asked Astafanos if he could give land mines to the pilot and Astafanos responded that he could. (Id. ¶ 18).

C.  The Defendant Travels to New York with AMA United to Procure the Items

On June 26, 2011, Astafanos, Boulos, and Tawdraus traveled to John F. Kennedy International Airport, in Queens, New York, from Cairo, Egypt, in order to conduct a series of meetings with UC-1 and obtain samples of the bomblet bodies and trumpet liners, along with a land mine, to bring back to Egypt, as well as to discuss arrangements regarding the anticipated purchase of approximately two million bomblet bodies with trumpet liners. Astafanos expressed to UC-1 that based on the thorough inspection of their luggage conducted upon their entry into the United States, they no longer felt comfortable attempting to transport the munitions out of the United States in their carry-on luggage. Astafanos requested that they discuss alternative methods to get samples of the bomblet bodies, trumpet liners, and the land mine to Egypt in a way that avoided inspection at the airport. (PSR ¶ 19).

On June 28, 2011, a meeting was held between UC-1, Astafanos, Boulos, Tawdraus, and another undercover law enforcement officer who served as an Arabic translator. At the meeting, which was surreptitiously recorded, Astafanos, Boulos, and Tawdraus identified themselves as representatives of AMA United Group. Astafanos stated that AMA United Group dealt with "top secret" military projects and had dealt with many United States companies, including companies located in New York and California. Astafanos, Boulos, and Tawdraus discussed with UC-1 specific contractual terms and acknowledged that United States export control laws applied to the transaction. Astafanos also acknowledged that AMA United Group could not receive the shipment of bomblet

bodies and trumpet liners because it was a civilian company, instead directing that the shipment must go directly to a military facility.  (PSR ¶ 20).

At the June 28, 2011 meeting, Astafanos, Boulos, and Tawdraus discussed alternative means of shipping the samples to Egypt, and the requirement for an export license regardless of the size of the shipments.  They also agreed that they would avoid obtaining a license for shipping the samples by falsifying the contents of the shipment.  Astafanos and Boulos specifically stated that they would not describe the contents of the package as a bomblet.  Astafanos claimed that once the samples were exported, inspected, and approved by AMA United Group's customer in Egypt, the manufacturer would then apply for an export license for the remainder of the shipment.  During the meeting, Astafanos, Boulos, and Tawdraus also examined and handled the samples of the bomblet bodies and the land mine, and discussed the land mine's specific capabilities.  (PSR ¶ 21).

On June 29, 2011, a second meeting was held between UC-1, UC-2, Astafanos, Boulos, Tawdraus, and others.  UC-1 again explained to Astafanos, Boulos, and Tawdraus that an export license was required to ship even a minimal number of the bomblet bodies and trumpet liners to Egypt.  The defendants acknowledged this, but indicated that they intended to ship ten bomblet bodies and trumpet liners via commercial carrier without obtaining a license.  They indicated, however, that they, or their ultimate end-user client, would later apply for an export license for the remainder of the shipment.  (PSR ¶ 22).

On July 1, 2011, UC-1 picked up Astafanos, Boulos, and Tawdraus in Jersey City and drove them to the area near Rockefeller Center in Manhattan.  Once there, UC-1 provided them with the bomblet bodies, trumpet liners, and the land mine, which they packaged for international shipping in the trunk of UC-1's vehicle.  Astafanos, Boulos, and Tawdraus discussed how to complete the shipping documents and commercial invoice.  With Boulos and Tawdraus standing beside him, Astafanos then filled out a commercial invoice for the package containing the bomblet bodies and trumpet liners and falsely described the contents of the package as "metal samples" and "copper samples," respectively, with a total value of $5.  He also filled out a commercial invoice for the package containing the land mine and falsely described the contents of the package as a "meter sample," with a value of $1.  The recipient on both packaging labels was "SAKR Factory," a munitions factory in Egypt, with an address in Egypt, as the destination address.  Astafanos, Boulos, and Tawdraus then, within view of UC-1, provided the packages to a representative of a shipping company, to be shipped internationally.  On July 1, 2011, Customs and Border Protection Officers seized the packages at John F. Kennedy International Airport.  (PSR ¶¶ 23-24).

D.      The Defendants Admitted to Their Conduct

On July 6, 2011, law enforcement agents executed a search warrant at the residence in Jersey City where Astafanos, Boulos, and Tawdraus had been staying during their time in the United States.  During the execution of the search warrant, each was consensually interviewed.  During the interviews, Astafanos confirmed that the three defendants had intentionally mislabeled the bomblet bodies, trumpet liner and land mine.  While he initially denied knowledge of the export license requirement, he later admitted that

5

UC-1 had informed them that an export license was required. Astafanos claimed he did not pursue an export license because he did not understand the seriousness of the law. Tawdraus also confirmed that he knew U.S. law required an export license to send samples to Egypt, but also claimed he did not understand the seriousness of the law. Boulos confirmed that UC-1 had advised the three men of the requirement to ship the items out of the United States, but claimed he did not know they needed an export license for samples. Later the same day, Astafanos, Boulos, and Tawdraus fled the United States and returned to Egypt. (PSR ¶ 24).

The defendant subsequently returned to the United States, using the same visa that law enforcement procured for him, and was later arrested on March 21, 2013, in connection with an immigration violation (visa overstay). Following his arrest, Tawdraus participated in two <u>Mirandized</u> interviews on March 21 and March 25, 2013. In those interviews, Tawdraus once again admitted his involvement in the instant offense and confirmed that he and the other defendants knew it was illegal to export the items. Tawdraus confirmed that he and Boulos were present when Astafanos completed the shipping documents and the shipment was sent. Tawdraus also indicated that upon returning to Egypt, he severed ties with AMA United Group because he was afraid of getting into trouble with United States authorities again. He was ultimately arrested for the instant offense on October 2, 2013. During a post-arrest interview, he repeated his previous statements, including admitting his involvement in the instant offense. (PSR ¶ 26).

### III. Sentencing Guidelines Range

The government concurs with the calculation set forth in the PSR and below, which is consistent with the government's estimate in the plea agreement:

Count One

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2M5.1(a)(1)(A)) | 26 |
| Less: Global Plea Reduction (§ 5K2.0) | -2 |
| Less: Acceptance of Responsibility (§ 3E1.1) | <u>-3</u> |
| Total Offense Level: | <u>21</u> |

(PSR ¶¶ 34-43). Tawdraus has a criminal history score of zero, and thus a criminal history category of I. (PSR ¶ 65). Based on a total offense level of 21 and a criminal history category of I, the defendant's Guidelines range of imprisonment is 37 months to 46 months. The defendant does not dispute this Guidelines calculation. <u>See</u> Letter of Defendant Amged Kamel Yonan Tawdraus, dated May 11, 2016, at 15, 16 ("Def. Ltr.").

### IV. Analysis

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and

to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

V. The Appropriate Sentence

For the reasons set forth below, the government respectfully recommends a sentence of incarceration, but does not oppose a modest downward departure below the applicable Guidelines range.

7

      A.      <u>Nature and Circumstances of the Offense</u>

The crimes the defendant committed, along with his co-defendants, were serious, involving shipping dangerous military items to the Middle East. This is precisely what the export regulations were designed to protect against. As the defendant recognizes, his conduct was largely if not exclusively motivated by greed. If he was able to consummate the transaction, he would have received an enormous commission. (Def. Ltr. at 15). That greed led the defendants to reject the legal requirement that was clearly and unambiguously presented to them: the items they sought to obtain required a license to ship outside of the United States, even for inert samples. Rather than obtain the license, the defendants made the calculated decision to try and export the items without complying with the law. This decision culminated in attempting to disguise the munitions so they could ship them from the trunk of a car in Rockefeller Center, using a blatantly false export declaration. This was not, as the defendant claims, a split-second decision. Rather, it was the result of months of negotiations and other failed attempts to secure the items without obtaining an export license.

Although the defendant acknowledges his guilt, he argues for a sentence of time-served, characterizing his conduct as a "minor violation to achieve [a] lawful objective." (Def. Ltr. at 14). In particular, the defendant asserts that a downward departure is appropriate for a number of reasons, including that: (a) law enforcement personal induced the defendants to commit criminal acts; (b) the defendants intended to obtain a license if they eventually obtained the contract from the Egyptian government to purchase the full order; (c) the defendants did not have adequate notice that a license was required for a sample; and (d) Astafanos was the ringleader of the transaction and the defendant only learned of the illegal conduct when he arrived in the United States. (<u>See</u> Def. Ltr. at 6-10). Each of these arguments is without merit and should be rejected.

The defendant argues that law enforcement agents, including UC-1, "sought, successfully, to cause AMA and its members to be subject to American law, and then to commit an [AECA] violation." (Def. Ltr. at 4). The defendant's argument is, of course, an attempt to deflect blame and culpability with a pseudo-entrapment defense that is inconsistent with the facts and the law. Even the defendant's selective attempts at parsing UC-1's communications with AMA United make plain that, from the outset of the parties' negotiations, UC-1 simply presented AMA with the basic licensing framework and gave them the option of which path to choose. It is beyond dispute that when presented with the choice, AMA United, including the defendant, chose to break the law. Notably, UC-1 presented the opportunity to conduct the transaction legally and, out of greed and convenience, the defendants chose the unlawful route. Indeed, the materials cited by the defendant make it clear that UC-1 informed the defendants of the licensing requirement. (<u>See</u> <u>e.g.</u>, Def. Ltr. at 5). Moreover, the defendant's own repeated admissions to investigators confirm that he knew about the licensing requirement but dismissed it because he did not appreciate the "seriousness" of the law. (PSR ¶ 24).

Similarly unavailing is the defendants' assertion that they would obtain an export license for the full order if they first obtained the contract from the Egyptian military.

8

As an initial matter, there is no license exception for a smaller quantity of controlled items. "Samples" require an export license, a fact that was made plain to the defendants throughout the commission of the crime and a requirement they now acknowledge. Moreover, there is nothing in the record to establish that the defendants would have obtained such a license, other than their speculative claims to UC-1 during the transaction. Given the defendants' repeated efforts to evade licensing requirements for the samples, there is little reason to credit their assertions that they would have obtained a license for the full order.

The defendant's related argument that his criminal conduct was less serious because AMA purported to act on behalf of the Egyptian military is similarly unavailing. Again, the defendant's argument is full of self-serving speculation that does not undercut the seriousness of the conduct. The defendant assumes that law enforcement agents should have verified that the parts were indeed destined for a factory owned by the Egyptian Military. The defendant ignores that this is the very reason the government requires an export license and accurate Shippers Export Declarations, to provide a level of assurance as to the end user and the end use of the commodities at issue.

Learning the identity of the end user, where the items are being shipped and for what purpose is critical in determining whether the transaction is legitimate or for undisclosed purposes. The failure to provide this information through a license and SED is particularly salient during the political unrest taken place in Egypt during AMA United's negotiations with UC-1. In January 2011, Egyptian President Hosni Mubarak was overthrown in a revolution that culminated in the election of Muslim Brotherhood candidate Mohamed Morsi in June 2012. See, e.g., "Muslim Brotherhood's Mohamed Morsi declared president of Egypt," The Guardian. 24 June 2012. Given the considerable state of unrest in Egypt during the relevant time period, providing the Department of State and the Department of Commerce with the opportunity to review the specifics regarding the export of highly dangerous munitions is essential to the integrity of the U.S. government's export regulatory schemes, and is far preferable to relying on the unsupported representations of three international arms brokers.

The defendant also claims that he is comparatively less culpable because Astafanos was the "head" of AMA, had the contacts with the military contractors in Egypt and was the ringleader of the charged conduct in the United States. Indeed, the defendant goes so far to claim that he did not know licensing was an issue until he arrived in the United States. (Def. Ltr. at 13). The defendant's assertions run counter to the information set forth in the PSR and in the defendant's own submission. As one of the three partners in AMA United, the defendant worked in the same office as Astafanos, had access to the AMA United e-mail account and had frequent discussions with Astafanos and Boulos about the transaction. The idea to ship the items using the Egypt Air pilot clearly originated outside of Astafanos, as the pilot was a friend of co-defendant Boulos. The notion that Astafanos and Boulos discussed the difficulty of exporting the samples without a license prior to arriving in the United States but excluded the defendant, their third partner, is implausible. As the defendant admits, the transaction with UC-1 would have presented an enormous profit for AMA United. It is illogical that the defendant was not familiar with the details of the

9

transaction.  Astafanos was the focal point of the communications with UC-1 because, as the defendant admits, Astafanos spoke the best English of the three partners.  The defendant now seeks to exploit that fact to minimize his involvement in the criminal conspiracy.

Finally, while the defendant acknowledges that U.S.S.G. § 2M5.1 applies to his conduct, he argues for a downward departure because the factors relevant to the Guidelines calculation are only "minimally present."  (See Def. Ltr. at 17).  However, as discussed above, the defendant's conduct involved serious, measured actions that had a potential effect on an important U.S. national security interest.  Contrary to the defendant's assertions, the defendant was involved in a plan to circumvent export controls and reporting requirements, both in Egypt and the United States.  Although Astafanos spoke the best English and was thus the locus of communications with UC-1, the defendant was intimately involved with the plans to export the items without a license in both Egypt and the United States.  The notion that the only "sophisticated planning" was engaged in by U.S. law enforcement officers is false.  (See Def. Ltr. at 17).

As set forth above, the defendants broached a number of ways to export the items without a license, including using an Egypt Air pilot as a courier and misrepresenting the contents of a package shipped by UC-1.  Only after UC-1 refused to comply with their suggestions, did the defendant come to the United States to engage in discussions regarding the proposed transaction and secret the samples out of the country without a license.  Indeed, from the moment they landed in the United States, the defendants focused on how they would be able to export the items without law enforcement oversight.  Similarly, as discussed above, although the attempted export was only for inert samples of munitions, the defendants contemplated a very large order of dangerous munitions, including landmines.

B. The Need for Deterrence

A sentence of incarceration would provide both specific and general deterrence to prevent similar crimes from taking place in the future.  Although the defendant has sought asylum in the United States, a sentence of incarceration would firmly guide the defendant's conduct in the event he ever seeks a return to his prior profession.  More importantly, a sentence of incarceration would provide a strong deterrent effect to similarly situated individuals seeking to skirt U.S. export regulations.  Others who are engaged in the procurement of U.S. origin munitions may claim ignorance of the law and express general disregard for the seriousness of the conduct.  A sentence of incarceration here will help inform others that similar conduct will lead to a prison sentence.   In short, serious punishment gives teeth to regulations that are critical to the security of our nation and our relationship with our allies.   Those seeking unregulated access to military grade weapons should not look to the United States to find them.

C. The History and Characteristics of the Defendant

The defendant has no criminal history, which is reflected in his Criminal History Category and therefore is deserving of no additional consideration in terms of

mitigation. His family circumstances are admittedly sympathetic, but no more so than many defendants who stand before this Court at sentencing. Nevertheless, the government agrees that under the specific facts presented here, a sentence below the applicable advisory Guidelines range may be sufficient to satisfy the statutory sentencing factors. To the government's knowledge, the defendant's efforts to circumvent U.S. regulations were limited to the offense conduct addressed herein, and the defendant was remarkably candid with investigators during multiple Mirandized interviews. Moreover, there is some evidence in the record to support the proposition that the defendant was attempting to supply what he perceived to be an ally of the United States, and that he and his company lacked the sophisticated legal counsel and compliance expertise commensurate of a corporation engaged in the business of international arms brokering. While these facts do not in any way excuse his conduct, they are relevant in imposing a just and adequate sentence.

VI.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of incarceration, but does not oppose a sentence below the applicable Sentencing Guidelines of 36 to 47 months' imprisonment; a sentence that is sufficient to promote respect for the law and justly punish the serious nature of the offense, but which is not greater than necessary to achieve the goals of sentencing. See U.S.S.G. § 3553(a)(2).

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By:    /s/ David C. Pitluck
Seth D. DuCharme
David C. Pitluck
Assistant U.S. Attorneys
(718) 254-6021 / 6108

cc:    Norman Trabulus, Esq. (by e-mail and ECF)
United States Probation Officer Jared Maneggio (by e-mail)