Norman Trabulus
345 SEVENTH AVENUE
21ST FLOOR
NEW YORK, NEW YORK 10001
(212) 221-7811 telephone
(212) 398-8835 telefacsimile

Member, NY Bar                                                              email: ntrabulus@gmail.com

December 15, 2016

Hon. Eric N. Vitaliano
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn NY 11201

Re: **Sentencing submission - USA v. Amged Tawdraus, 13 CR 612 (ENV)**

Your Honor:

This letter responds to the Government's December 13, 2016 sentencing submission for Mr. Tawdraus.

The government's requests a sentence that would be disproportionate under the 3553(a) factors. Under a different sentencing scheme, which, thankfully, does not apply, such a sentence might be commensurate with the money, time and resources expended on the undercover operation here. In the end, that operation, at least in Mr. Tawdraus instance, did not yield a bad actor. The government cannot be faulted for that. It did not know that until the end. Such operations are surely a legitimate and, one hopes, often successful way to catch truly bad actors awaiting an opportunity to ship, to whomever, dangerous munitions without a license.

Mr. Tawdraus does not consider the government to have egg on its face. If the government is concerned that it may, it should, however, not ask this Court to help wipe it off with a further chunk of Mr. Tawdraus life, under a retrofitted set of facts skewed to justify such a sentence.

The government's submission seriously mischaracterizes what happened, from beginning to end. Mr. Tawdraus was *not* involved in a scheme of many months'

standing to arranged an unlicensed munitions export, even of just the samples. He and his business partners were *not* contemplating an ultimate shipment of millions of unlicensed munitions parts if a license could not be obtained. These things are simply not true, and the record shows it.

The government's submission recapitulates much of the "offense conduct" section of the PSR. As Mr. Tawdraus previously demonstrated, that presentation was materially omissive. It did not disclose that it was UC-1[1] who first suggested shipping without a license. It did not disclose that the defendants' response was that they wanted his company to obtain a license. It did not disclose that it was UC-1 who first requested that a sample be shipped to him under the (literally true) description "metal parts", without informing the defendants, as he knew but they did not, that a United States license was required for that.

It does also does not disclose Mr. Astefanos and UC-1 had been in communication for months about UC-1 shipping his samples to Sakr factory, without UC-1 ever telling him that even inert samples exclusively for contract negotiation purposes required a license, or assigning that requirement, as opposed to business considerations, as the reason why he had not shipped them already. And, when, almost in passing, UC-1 belatedly adverted to the licensing requirement, the PSR, and the government submission, do not disclose that Mr. Astefanos expressed confusion why inert metal samples for negotiation purposes could not be shipped under that description, just as he had shipped such a sample to UC-1 at the latter's direction, so as to avoid, not evade, a licensing requirement.

Notably, the government's submission does not deny that a single one of these things actually happened, or the accuracy or completeness of the set of emails and of the account set forth in Mr. Tawdraus' original submission. Instead, it terms these facts a "pseudo-entrapment defense."

It is the government which has now thus inserted entrapment into the discussion. Mr. Tawdraus pled guilty. He did not elect to assert entrapment. These facts are

---

[1] Mr. Tawdraus' original submission, filed under seal, referred to UC-1 by his given name.

presently relevant in that they show that Mr. Tawdraus was not planning to violate United States law for months in Egypt. He only did so in the United States, after the United States brought him here for that purpose, and only then made clear to him that a licensing requirement applied even to the shipment of inert samples for negotiation; he, in the hope of saving a negotiation for a lawful contract, participated in the shipping of unlicensed, mislabeled samples. That these facts might have supported an entrapment defense which is not before the Court neither changes them nor is a reason not to consider them for their present relevance.

In an attempt to prior impute unlawful intent to Mr. Tawdraus, the government's submission references a plan, which literally never got off the ground, for an Egyptian airline pilot to bring the samples from UC-1 to Egypt. Mr. Tawdraus had limited awareness of it at the time. He knew UC-1 was having some problem shipping the samples and wanted the defendants to pick them up themselves. There was urgency in getting the samples to Sakr factory which had set a deadline. He was aware that Mr. Astefanos was trying to get a pilot to bring them to Egypt. He did not understand a license was required or that bringing them would violate United States law. Why should Mr. Astefanos have told him, even *if* Mr. Astefanos himself understood that? Mr. Astefanos is believed to have proffered extensively to the government, but its submission does not state either that he said he knew at the time or that, if so, he told Mr. Tawdraus.

Mr. Tawdraus learned the pilot backed out. Later, he heard it was because the pilot was concerned about violating *Egyptian* law. Egyptian law does not allow civilians to possess military materials without permission from the Egyptian military; the pilot was concerned that an Egyptian customs inspection might land him in trouble. For the same reason, when Mr. Astefanos tried to get UC-1 to ship the samples himself by international courier, he gave Sakr's address to UC-1 and him to ship them directly there, rather than to the defendants, who could not lawfully possess them in Egypt. This was notwithstanding that brokers hoping to earn a finder's commission typically avoid direct contact between the parties.

The government is correct to observe that the defendants might not have ultimately obtained a license themselves. The could not have. As foreign persons, they were ineligible to obtain one, though they may not have known that. It is the

domestic supplier, such as the erstwhile company that UC-1 pretended to represent, which is eligible to and customarily does obtain a license.

It is absurd for the government to argue that defendants would have negotiated a contract calling for the shipment of millions of items of munitions to Sakr factory. That factory is an arm of the Egyptian government. Sakr well knew that the United States required a license to export munitions (though one email produced suggests that at least someone there did not understand that applied even for inert sample parts sent purely for negotiation purposes).

The only way the defendants to have earned their hoped-for commission was to succeed in negotiating a contract between the Egyptian government and UC-1's supposed company. Though UC-1 would have been more than willing to agree to an unlicensed contract, the Egyptian government would not. Criminal recipients might take the resulting risk of the whole deal aborting, and would certainly not care about offending the United States government. Not the Egyptian government. It needed a reliable, quality supplier for its national military needs, and would certainly not want to offend the United States, a source of billions in military aid. When the defendants said the ultimate contract shipments would be licensed, and said it over and over, they meant it, 100%. The agents may not have known that at the time, but the government should surely realize it now.

A time-served sentence is not a noncustodial sentence. Mr. Tawdraus already served 36 days in prison. That, as was demonstrated in his original submission, suffices to comply with the purposes of 18 U.S.C. § 3553(a). Mr. Tawdraus is not asking the Court to go out on a limb for him. The *Sevilla* and *Groos* cases cited in and appended to his original submission show that. So does Guideline 2M5.1 Application Note 2 which recognizes that the Guideline paints with a very broad brush and authorizes downward departures based on factors which, in extreme form, are present here. Mr. Tawdraus should receive a sentence of time served.

Respectfully submitted,
        /S/
Norman Trabulus