1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    :   13-CR-612(ENV)
                             :
                             :
                             :
        -against-            :   United States Courthouse
                             :   Brooklyn, New York
                             :
                             :
                             :
MALAK NESEEM SWARES          :   Friday, December 16, 2016
BOULOS AND AMGED KAMEL       :   11:00 a.m.
YONAN TAWDRAUS,              :
                             :
        Defendants.          :
                             :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE ERIC N. VITALIANO
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:


For the Government:      ROBERT L. CAPERS, ESQ.
                         United States Attorney
                         Eastern District of New York
                             271 Cadman Plaza East
                             Brooklyn, New York 11201
                         BY: DAVID C. PITLUCK, ESQ.
                             Assistant United States Attorneys

For the Defendant:       BRUNO & FERRARO
                         Attorneys for the Defendant -
                         MALAK NESEEM SWARES BOULOS
                             261 Park Avenue
                             Rutherford, New Jersey 07070
                         BY: JOHN J. BRUNO, ESQ.

2

```
 For the Defendant:     LAW OFFICE OF NORMAN TRABULUS
                        Attorneys for Defendant -
                        AMGED KAMEL YONAN TAWDRAUS
                        345 Seventh Avenue, 21st floor
                        New York, New York 10001
                        BY:  NORMAN TRABULUS, ESQ.
                        BY:  ALEXANDRA TSEITLIN, ESQ.


Court Reporter:  Angela Grant, RPR, CRR
                 Official Court Reporter


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.
```

PROCEEDINGS                                    3

1              (In open court.)

2              (Defendants present in open court.)

3              COURTROOM DEPUTY:  Next case on the calendar is

4    USA versus Boulos, Tawdraus and AMA United Group.  Case

5    number 13-CR-612 on for a sentencing.

6              Will the parties please note their appearance

7    beginning with government counsel.

8              MR. PITLUCK:  Good morning, Your Honor.

9              On behalf of the United States, David Pitluck.

10   And with me at counsel table is Jared -- whose last name I'm

11   going to --

12             MR. MANEGGIO:  Maneggio.  Good morning, Judge.

13             MR. PITLUCK:  I didn't want to butcher that.

14             Good morning, Judge.

15             THE COURT:  Good morning.

16             You're all by yourself today, Mr. Pitluck, aside

17   from Officer Maneggio?

18             MR. PITLUCK:  I'm sorry?

19             THE COURT:  You're all by yourself today?

20             MR. PITLUCK:  I am.

21             THE COURT:  You got rid of DuCharme?

22             MR. PITLUCK:  He sends his regrets.  He is

23   traveling.  But he's very much aware of all of the issues

24   and has been involved so he apologizes for not being here.

25             THE COURT:  Tell him we're going to hold that

PROCEEDINGS                          4

1   against him.

2           MR. PITLUCK:  I already told him that, Judge.

3           MR. BRUNO:  Good morning, Your Honor.

4           On behalf of Mr. Boulos, John Bruno.

5           MR. TRABULUS:  Good morning, Your Honor.

6           On behalf of Mr. Tawdraus, Norman Trabulus.  And

7   on Mr. Tawdraus' other side is Alexandra Tseitlin, second

8   counsel in this case.

9           MS. TSEITLIN:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          COURTROOM DEPUTY:  Counsel for both sides are

12  present, including defendants.

13          We also have an Arabic interpreter who needs to

14  note his appearance for the record and also needs to be

15  sworn.

16          (Interpreter sworn.)

17          COURTROOM DEPUTY:  Please state your name for the

18  record.

19          INTERPRETER KANE:  Mansour Kane.

20          COURTROOM DEPUTY:  Thank you.

21          THE COURT:  Welcome.  Always a pleasure to have

22  interpreters who do such marvelous work for us and necessary

23  work.

24          Mr. Bruno, you got through the tunnel and gridlock

25  alert day?

PROCEEDINGS                           5

1           MR. BRUNO:  Yes.  Yes.  Took a different route

2    today.

3           THE COURT:  That's probably a good idea.

4           All right.  Defendants are ready for sentencing?

5           MR. BRUNO:  Yes.

6           Does the Court have a preference?

7           THE COURT:  The Court has no preferences other

8    than whatever Mr. Villanueva is happiest about so we'll

9    proceed from there.

10           What we're going to do is given the obvious

11    overlap, we're going to take responses on all three cases at

12    the same time and we will deal with those responses as they

13    come.  So the first thing that I want to establish on the

14    record is whether or not anyone believes, any party, that

15    they are entitled to a Fatico hearing and are requesting

16    one.

17           MR. PITLUCK:  No, Your Honor.

18           MR. TRABULUS:  No, Your Honor.

19           MR. BRUNO:  No, Your Honor.

20           MR. TRABULUS:  Your Honor, when Your Honor

21    indicated three cases, I believe Your Honor was referring to

22    the corporation.

23           THE COURT:  The corporation.

24           MR. TRABULUS:  Now, it's true that the plea for

25    the corporation was entered in by the individual defendants,

PROCEEDINGS                           6

1   but I don't know that any counsel here is representing the

2   corporation.

3           THE COURT:  We can't figure that out either so up

4   until now, Mr. Trabulus, it was masked on the record, but

5   you've now exposed it.

6           MR. TRABULUS:  Okay.  Thank you.

7           THE COURT:  So given the coincidence of interests

8   here, I'm appointing you and Bruno to be the counsel for the

9   corporation.

10          MR. TRABULUS:  Okay.  Okay.

11          MR. BRUNO:  I accept that, Judge.

12          THE COURT:  Without fee.

13          MR. TRABULUS:  Understood.

14          THE COURT:  It's pro bono.  I don't think

15  corporations are entitled to CJA so.

16          MR. TRABULUS:  I thought that perhaps the

17  government might produce Mr. Astafanos to speak for it.

18          THE COURT:  You're jumping in very far ahead,

19  Mr. Trabulus.

20          MR. TRABULUS:  Thank you.

21          THE COURT:  In any event, let me next establish on

22  the record, and Officer Maneggio will help us on this, that

23  whether all parties have received a copy of the Presentence

24  Report.  There's at least one addendum I believe, right?

25          MR. MANEGGIO:  Yes, for Tawdraus.

PROCEEDINGS                              7

1          THE COURT:  Does anybody else have an addendum?

2          MR. MANEGGIO:  No, Judge.

3          THE COURT:  Just in the case of Mr. Tawdraus,

4    that's an addendum.

5          MR. TRABULUS:  Yes.

6          THE COURT:  And, most importantly, I want to

7    establish on the record that counsel have had a full and

8    fair opportunity to review the Presentence Report with their

9    client.

10         MR. TRABULUS:  Yes, Your Honor, I have.

11         MR. BRUNO:  Yes, Your Honor, we have.

12         THE COURT:  Let the record also reflect that

13   probation has not made available to the Court any

14   confidential information about the facts and circumstances

15   of this offense or the personal characteristics or history

16   of the defendants that have not been shared with each of the

17   individual defendants so that we are working off the same

18   record.

19         Now, with respect to that record, I take

20   objections and exceptions in three parts.  The first area of

21   inquiry with respect to the individual Presentence Report

22   are any objections or exceptions to those paragraphs that

23   relate to the offense of conviction and the personal

24   characteristics and history of the individual defendant

25   named in the PSR.

PROCEEDINGS                          8

1          Any objections or exceptions to those?

2          MR. TRABULUS:  Yes, Your Honor.  I think the -- in

3    my submission, which was under seal, originally filed on

4    May 11th, I demonstrated respects in which the offense

5    conduct portion was, in my view, in our view, omissive.

6          I also noted that there was an error in the

7    Presentence Investigation Report insofar as it indicated

8    that the defendant had been released immediately, whereas,

9    in fact, he had spent either 36 or 37 days at MDC.  So that

10   was a very specific factual objection.

11         THE COURT:  Were they corrected in the addendum?

12         MR. MANEGGIO:  The date of release was, Your

13   Honor.

14         MR. TRABULUS:  I'm sorry.

15         THE COURT:  So we're doing it as amended by, in

16   your case, by the addendum.

17         MR. TRABULUS:  I'm sorry, Your Honor.  I've had a

18   busy week, two weeks, and I may have missed that correction.

19   I apologize.

20         So I would say that the injections or some of

21   which are really more in the nature of supplementation were

22   fully set forth in that filing.

23         THE COURT:  We'll take the supplementation as part

24   of the sentencing hearing.  So it will be part of the

25   hearing, but there isn't -- you're referencing the one error

PROCEEDINGS                    9

1  of commission has been corrected, and what you believe are

2  other relevant facts you will have the opportunity to

3  present to me during that portion of the hearing this

4  morning.

5              MR. TRABULUS:  Yes, Your Honor.

6              THE COURT:  Let me move on to -- and Officer

7  Maneggio, I'm going to ask you to refresh us on these two

8  items with respect to each defendant, the area relating to

9  the computation of the offense level.  Taking objections and

10 exceptions with respect to those paragraphs and to the

11 recommendation of probation, and Officer Maneggio will fill

12 in for us now what those recommendations were.

13             MR. MANEGGIO:  I apologize, Judge.

14             THE COURT:  Offense level.

15             MR. MANEGGIO:  The total offense level of 23.

16             THE COURT:  And this is on all three defendants?

17             MR. MANEGGIO:  Yes, Judge, all two.  Both, Judge.

18             THE COURT:  Both defendants?

19             MR. MANEGGIO:  Yes.  A total offense level of 23

20 with a guideline range of 46-to-57 months.

21             THE COURT:  We're going to get to the Criminal

22 History Category, but the first area is offense level.  With

23 respect to Defendants Boulos and Tawdraus it's at 23.

24             Any objections or exceptions to those paragraphs

25 or to that recommendation?

PROCEEDINGS                          10

1            MR. TRABULUS:  Well, I believe that under the plea

2    agreement it was to be 21 and that was a global plea.  So I

3    believe that that is correct.  But in terms of the

4    computation in terms of the guidelines, no, there is no

5    objection.

6            THE COURT:  The global -- we used to take them

7    originally, they were classified here at least in this

8    district as departures.  Nationally now they're classified

9    as variances for whatever reason.  So it doesn't really

10   change the algebra of the guideline itself, but it's taken

11   into account as a two-level reduction for purposes of

12   computing the guideline range, if you will.

13           So the actual offense level that goes on the J&C

14   will be level 23.

15           Any objection or exception to that?

16           MR. PITLUCK:  No, Judge.

17           THE COURT:  Hearing none, that recommendation is

18   adopted.

19           And, lastly, the paragraphs relating to the

20   computation of the Criminal History Category and the

21   recommendation of Criminal History Category I, any objection

22   to that?

23           MR. TRABULUS:  No, Judge.

24           MR. BRUNO:  No, Your Honor.

25           THE COURT:  And that is adopted as well.

```
                        PROCEEDINGS                    11
```

1              Now, the record will reflect that -- I somewhat

2      lost count in your case, Mr. Trabulus, of the various

3      filings that have been made.  I think you filed three, three

4      submissions, including exhibits.  The Court acknowledges

5      receiving that.

6              Mr. Bruno, you have one with exhibits.  The Court

7      acknowledges receiving that, and, obviously, we have the

8      Presentence Report and the addendum to it in connection with

9      Mr. Tawdraus.  We have letters from the government with

10     respect to Defendants Boulos and Tawdraus.

11             I don't believe we have written submissions with

12     respect to AMA.

13             MR. PITLUCK:  We did not file anything related to

14     AMA, Judge.

15             THE COURT:  And counsel appointed today didn't

16     file any?

17             INTERPRETER KANE:  I'm sorry, Your Honor.  I'm

18     sorry.  I didn't hear what --

19             MR. PITLUCK:  I said we didn't file anything

20     related to AMA United.

21             MR. TRABULUS:  And, of course, we haven't, Your

22     Honor.

23             THE COURT:  Have I correctly gotten all that you

24     think we have filed?

25             Yes?  Everybody agrees?

PROCEEDINGS                              12

1          MR. BRUNO:  Yes.

2          MR. TRABULUS:  Yes.

3          THE COURT:  Now, and I'll let counsel confer on

4   this.  Who wishes to be heard first on sentencing,

5   Mr. Boulos or Mr. Tawdraus?

6          MR. TRABULUS:  As between the two of us, I will go

7   first, Your Honor.

8          THE COURT:  And that's in accord with you,

9   Mr. Bruno?

10         MR. BRUNO:  Yes, Judge.  That was my original

11  question, if the Court had a preference --

12         THE COURT:  That's what you meant?

13         MR. BRUNO:  Yes.

14         THE COURT:  I have no preference.  In these

15  situations, I only have a preference if counsel disagree.

16  If counsel agree, I am more than happy to listen.

17           And what I intend to do, Mr. Pitluck, I'm going to

18  ask you about this at this point.  Do you wish to be heard

19  seriatim or do you wish to be heard at the conclusion of the

20  remarks of both Mr. Trabulus, Mr. Bruno and their clients?

21         MR. PITLUCK:  I'd prefer to go last, Judge.

22         THE COURT:  At once?

23         MR. PITLUCK:  At once and I can respond to

24  everything.  And if the Court has any questions on the

25  corporate resolution, which I probably won't be able to

PROCEEDINGS                                    13

1    answer, I will address those as well.

2         THE COURT:  So much paper generated for something

3    that doesn't exist anymore is remarkable, but we'll talk

4    about that later.

5         Mr. Trabulus, then, we will hear you first on

6    behalf of Mr. Tawdraus.  My normal practice is that I would

7    allow Mr. Tawdraus to speak himself before we hear

8    Mr. Bruno.

9         MR. TRABULUS:  Thank you, Your Honor.

10        I, too, prefer not to go last or to have the

11   government go first.  And I hope that if the occasion

12   arises and it becomes necessary, I might be given an

13   opportunity to speak if something he says surprises me.

14        Your Honor, there's been a lot of paper, and I

15   think virtually everything that I am saying now is found in

16   those papers.  But to just lay it out, again, my point is

17   that the time that he's already served, which is either 36

18   or 37 days, keep on coming up with a different number,

19   suffices to comply with the purposes of 3553(a).

20        And I'd like to start with the nature of the

21   offense.  And this was not a plan of longstanding to

22   violate U.S. law.  It was a plan of months' standing to try

23   to negotiate a contract which was going to be between a

24   supplier in the United States and the Egyptian government

25   for the purposes of munitions, which I'm sure the Egyptian

PROCEEDINGS                    14

1    government would never have purchased without a license.

2         I've indicated in my filings who it was who first

3    suggested doing it without a license.  The purpose of all

4    that is not to raise some kind of defense which defendant

5    decided not -- elected not to assert, but just to

6    illustrate --

7         THE INTERPRETER:  I'm sorry.  Can I face you or I

8    mean...

9         MR. TRABULUS:  Face me?  It's up to the Judge.

10         THE COURT:  You can.  Whatever facilitates your

11    ability to translate for Mr. Tawdraus and Mr. Boulos the

12    Court is happy to allow you to do.

13         MR. TRABULUS:  I'm just going to stand back a

14    little bit if that's okay, Your Honor.  And it may mean that

15    I'm not facing Your Honor.

16         THE COURT:  Once you get that far back I can't see

17    anyway so it doesn't matter.  You can get as far back as you

18    like.

19         MR. TRABULUS:  So the point that I'm getting at,

20    and I'm going to say at least Mr. Tawdraus, and I'm saying

21    at least with -- not suggesting that the situation was any

22    different from Mr. Boulos, but Mr. Tawdraus is my client.

23    He's the one that I've spoken to.  He did not enter the

24    United States.  And Your Honor has also heard how he came to

25    enter the United States expecting to violate any law here.

PROCEEDINGS                          15

1          He did violate a law here, there's no question

2    about it.  And we're not taking away from that.  He learned

3    about that when he was here.  He was facing a situation

4    which basically he was trying to save a contract.  He had a

5    deadline that the Egyptian government factory in Egypt had

6    given him for the samples.

7          What he did, Your Honor, and Mr. Pitluck took us

8    to task and actually misquoted our submission.  It's true

9    Mr. Tawdraus conceived of it at the time as something

10   relatively minor that he was doing, but he knew it was

11   wrong.  And whether it was minor or not, that really, I

12   guess, is for somebody else to decide, but it's not

13   inaccurate to say that.  And I guess the reason he thought

14   it was minor was that he wasn't talking about doing an

15   illegal contract.  He wasn't talking about shipping

16   something that was dangerous.  He wasn't talking about

17   shipping that was -- he wasn't doing -- shipping something

18   that was actually going to be made into munitions.  It was a

19   sample.  It was a sample which a soccer factory requested

20   just as the undercover had earlier requested a sample and

21   directed that it be shipped to him without a license.

22          So, Your Honor, that's the front end of it.  The

23   back end of it, the back end of it is that there was never

24   any plan, any conception that this ultimate shipment, that

25   the contract itself, the munitions would ultimately be

PROCEEDINGS                          16

1   shipped without a license.  I mean, it's, it's like making a

2   contract with the United States government to buy heroin

3   from it.  It doesn't happen.  Things like that don't -- it

4   can't happen.  The Egyptian government isn't going to risk

5   something like that.  They're not going to risk having a

6   contract aborted.  They're not going to risk offending the

7   United States which paid -- gave it billions of dollars to

8   buy munitions and buy military stuff.  They're not going to

9   risk that.

10          And I know in the government's submission they

11  talked about how these are pretty ugly things, cluster

12  bombs, land mines, and they are.  I mean, even just -- they

13  are.  There's no question about it.  We have them -- I don't

14  know whether we have those things anymore in our military

15  arsenal.  We certainly have things that are designed to kill

16  people and that's not very pretty.  But governments and

17  militaries are supposed to have those things.  They protect

18  those nations and they protect those people.  So these were

19  not people who were going to ship something to whomever.

20  Their connection was with the Egyptian government.

21          Now, in terms of whether it's minor or major in

22  the guidelines, the guideline range would be the same as I

23  understand.  If instead of what happened the defendants had

24  actually shipped 10,000 rocket launchers to the Taliban or

25  bombs to Iran, and these are one size fits all guidelines, I

1    guess they don't come up often enough for the sentencing

2    commission to spend as much time on them as they do on drugs

3    and stuff like that.  So what you've got is something that

4    doesn't make fine differentiations.  You don't have a

5    difference between heroine and marijuana or between

6    50 kilograms and 5 grams.  But you have, instead, an

7    application note which authorizes departures, and it fits

8    precisely this case.

9           And there are other cases that I cited to Your

10   Honor, Groos case, the Sevilla case.  And, Your Honor, I

11   would submit to you that no one would consider it to be

12   going out on a limb on the facts here to impose a

13   noncustodial sentence.

14          The other thing that I want to tell Your Honor,

15   and I don't know how well it can be conveyed.  It showed up

16   some ways in the letters on behalf of Mr. Tawdraus.  I truly

17   believe, Your Honor, that probably very infrequently has

18   Your Honor had the occasion of sentencing a man or will have

19   the occasion of sentencing a man with a character as fine as

20   his.  And it becomes apparent to anybody who knows him who

21   spends time with him, he's a gentle, kind man who made very

22   good use of his time after the government agreed to his

23   release for which I greatly thank the government, as does

24   he.

25          The only thing he failed to do that he tried to do

PROCEEDINGS                                18

1   during that time, Your Honor, was to secure an opportunity

2   to do volunteer work for severely disabled people who

3   couldn't move or talk, like his sister was because he cared

4   for her.  And the reason he couldn't do it was because of

5   these pending charges.

6           Your Honor, again, I've made my suggestion that

7   for purposes under the facts of this case and under the

8   nature of this particular guideline, notwithstanding that if

9   it comes in higher, under the facts and circumstances of

10  this case, he's already been punished sufficiently to comply

11  with the purposes of 3553(a).

12          And thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Trabulus.

14          Now, Mr. Tawdraus, obviously, you know

15  Mr. Trabulus has been a vigorous advocate on your behalf.

16  But notwithstanding that fact, under the law in the United

17  States, an individual defendant has a personal right of

18  statement, the ability to address the sentencing judge

19  before the judge passes sentence.  It is a right to speak,

20  not an obligation to speak.  But if you do wish to avail

21  yourself of your right, now is your opportunity to speak.

22          DEFENDANT TAWDRAUS:  My name is Amged Kamel

23  Tawdraus.  And I am now in front of you, Your Honor, and at

24  this sentencing hearing.

25          And I wish from you, Your Honor, I would like --

1    I'm sorry.  I would like you, Your Honor, to listen to me.

2    What I just told you, Your Honor, before.  And today, I came

3    today and to allow me, Your Honor, to tell you my, my

4    thought and my thought from my heart.

5              And you know, Your Honor, all what happened, all

6    things that is what happened in this case and there is no

7    going back from this thing, Your Honor.  I apologize from

8    you -- I mean to you and to the American people.  That's why

9    I want to be -- I want to be a very law abiding person.  And

10   I want to -- and I want to tell you, Your Honor, and I want

11   to propose, I want to do things, positive things, Your

12   Honor.

13             And I work all week first.  I'm an inspector, a

14   technical inspector.  And at the end of the week, and I work

15   at a gas station.  And I get, lastly, from -- I receive

16   lately --

17             MR. BRUNO:  Judge, the interpreter that we've used

18   in the past is raising his hand, and my client is even

19   having difficulty understanding this interpreter.  We're

20   having a lot of problems.

21             THE COURT:  Do you have an interpreter?

22             MR. TRABULUS:  Yes, Your Honor.  This is Mr. Sassi

23   who has been throughout working with us and has been, Your

24   Honor, through a mixup he was not assigned by the

25   interpreter's office today.  And there's no faulting here,

PROCEEDINGS                                    20

1    but they got used to each other's dialects and so forth.

2            So if Mr. Sassi may come toward, Your Honor, and

3    he can be sworn too.  I have no objection to that.  I

4    brought him here earlier today on my CJA because we wanted

5    to meet and discuss some things prior to sentencing and so

6    that's why he's here.

7            THE COURT:  Given the difficulty, Mr. Pitluck, do

8    you have any objection to that?

9            MR. PITLUCK:  No, Your Honor.

10           Mr. Sassi has been present for most of our

11   conferences.  I'm fine with that.

12           INTERPRETER SASSI:  Your Honor.

13           THE COURT:  Good morning.

14           COURTROOM DEPUTY:  Please note your appearance for

15   the record.

16           And I think you've been sworn in this case before?

17           INTERPRETER SASSI:  Yes.

18           COURTROOM DEPUTY:  Just note your appearance for

19   the record, please.

20           INTERPRETER SASSI:  My name is Brahim Sassi.

21   B-r-a-h-i-m.  Last name Sassi, S-a-s-s-i.

22           Good morning.

23           COURTROOM DEPUTY:  Thank you.

24           THE COURT:  Good morning, Mr. Sassi.

25           INTERPRETER SASSI:  Good morning, Your Honor.

PROCEEDINGS                    21

1          DEFENDANT TAWDRAUS:  (Through Interpreter Sassi)

2          Your Honor, I work all the week as a technical

3     agent in a construction company.  And on a weekend I work at

4     the gas station.  Finally, I receive from the service

5     evaluation as a bachelor degree as an electric engineer.

6     And now at this present time I continue my studying through

7     the Internet so to improve my education, so I can give a

8     positive effort and endeavor for the American companies so

9     they respect my work and my services.

10         Your Honor, I want -- I will not save an effort

11    for myself to study and to improve my situation and my level

12    and to realize all my wishes and my dreams in America is the

13    land of opportunity.  I would like to tell you that I'm --

14    that forgive me, and I am remorseful about that.  And I do

15    thank you for that.

16         THE COURT:  That completes the statement,

17    Mr. Sassi?

18         MR. TRABULUS:  Are you done?

19         INTERPRETER SASSI:  Yes, Your Honor, that's the

20    whole statement.

21         MR. TRABULUS:  Yes, sir.  Thank you.

22         THE COURT:  Thank you very much.

23         Mr. Bruno, do you wish to be heard on behalf of

24    Mr. Boulos?

25         MR. PITLUCK:  I'm sorry, Your Honor.  I don't mean

1   to interrupt.  I just want to make it clear that up to this

2   point the defendants, even though there may have been some

3   difficulty understanding the translator, have been able to

4   understand the proceedings to this point.  And if there's

5   anything that they missed, we can go back.  I just want to

6   make sure that the record is clear on that.

7            THE COURT:  Mr. Trabulus and Mr. Bruno, if there

8   were difficulties in what Mr. Pitluck is raising, if there

9   were difficulties in the interpretation prior to the time of

10  Mr. Sassi's arrival, is there anything that we must touch

11  base again on or are we free to go forward with the

12  understanding that both defendants have understood the

13  proceedings up to that point and are content to proceed

14  further?

15           MR. TRABULUS:  May I just make inquiry of my

16  client?

17           THE COURT:  Yes.

18           (Brief pause.)

19           MR. TRABULUS:  Yes, Your Honor, we're okay.

20           THE COURT:  Mr. Bruno?  Both?

21           MR. BRUNO:  Judge, I think it would help if I -- I

22  think with the dialects with the gentleman that filled in, I

23  think it would be best suited to stand closer to Mr. Boulos.

24  Mr. Boulos has another interpreter that he's used in the

25  building, and we tried to request him today.  He did not get

PROCEEDINGS                         23

1   here so I think it makes sense.  There's problems with the

2   dialect, but I think if we go slowly, we've always been able

3   to communicate very well in Mr. Trabulus' office and

4   whenever we've met so.

5              THE COURT:  So the question is whether or not

6   there's anything that we have to go back to.

7              MR. BRUNO:  No.  No.

8              THE COURT:  All right.  Then we're ready to go

9   forward.

10              MR. PITLUCK:  Thank you, Judge.

11              THE COURT:  And then going forward, Mr. Bruno.

12              MR. BRUNO:  Thank you, Judge.

13              THE COURT:  It's your cue.

14              MR. BRUNO:  Judge, before I address the Court with

15   my comments, Father Moises is here today, and he gave me a

16   letter that did not make it to the Court or to the

17   government.  And if I could take the liberty of reading a

18   very brief letter.

19              THE COURT:  Sure.

20              MR. BRUNO:  Thank you, Judge.

21              This is from the Coptic Orthodox Church in Cedar

22   Grove, New Jersey.  Father Moises Boghdady testifies that

23   Mr. Malak Boulos is an active member of our church.  He

24   volunteered 70 hours of community service at our church

25   taking the holy bread.  Mr. Boulos is a faithful and

PROCEEDINGS                    24

1   dedicated person.  He is well structured and persistent, and

2   he goes out of his way to help others.  He serves with a

3   joyful and giving spirit.  Mr. Malak is loved and

4   appreciated by everyone.

5          Mr. Boulos' family, his wife Raina, his two

6   daughters, are well known to us and to the congregation.

7   The Boulos family attend all church services and are loved

8   and respected by everyone.  And this is signed Father Moises

9   Boghdady with his seal.  And he's in court today.

10         THE COURT:  Thank you, Mr. Bruno.

11         MR. BRUNO:  Before Your Honor imposes sentence,

12  Your Honor needs to weigh the aggravating and mitigating

13  factors.  Certainly, there's a need to deter Mr. Boulos and

14  others from committing this type of offense.

15         On the mitigating side, I think it's fair to say

16  that Mr. Boulos did not intend to harm anyone.  He did not

17  intend to harm the United States in any way.  He has no

18  history of prior delinquency or criminal activity as an

19  adult prior to this incident or subsequent to this incident.

20  He has accepted responsibility and he would respond

21  favorably to probation.  He is unlikely to re-offend.  And I

22  do not believe that there's a risk that he will re-offend.

23  And I base that on his unblemished and spotless background.

24         Mr. Boulos is 45 years old.  He's married with two

25  children.  He's gainfully employed, working for meager

PROCEEDINGS                          25

1  wages, but he works nonetheless.  As I indicated in my

2  letter of submission, he lost a decent paying job at Lukoil,

3  but he has filled in the gaps of employment by working

4  various jobs for meager wages.

5           He's well-educated.  He loves this country.  His

6  citizenship in this country is pending.  He's applied for

7  asylum prior to being charged criminally, which is

8  indicative of his loyalty to this country.  He is remorseful

9  and accepts full responsibility for his actions.  He's a

10 very religious young man, and he's very active in his church

11 and community.

12          Judge, some people find religion on the day of

13 their sentencing.  I see it all the time, and I've been

14 doing this for 36 years now.  And it's, it's incredible how

15 spiritual people get the day they have to face a judge.

16          I know him from the church.  My office does a lot

17 of legal work for the church.  And prior to this case I

18 could tell you with certainty that he's a very religious man

19 and did not bring the priest here today by way of urging him

20 to show that he knows him.  These people have a very, very

21 cohesive relationship and he does with the entire church.

22          Judge, everybody called me leading up to this

23 sentencing that Judge Vitaliano will find forgiveness in his

24 heart, and his entire church is praying that you're going to

25 impose a period of probation.  I promise you, Judge, that

1   the government will not lose sleep if you impose a

2   probationary term.

3          He's a good man.  And I got a call last night and

4   it was so out of character for Mr. Boulos to be excited

5   because he's such a mild mannered person.  And I had to hold

6   the phone away from my ear because he was so excited and he

7   was crying and I couldn't make out what he was saying.  And

8   he put the priest on the phone who was with him at his home

9   last night, and I asked the priest to put Malak back on the

10  phone after I spoke to him and deciphered what he was trying

11  to say.  He was very upset and excited because he got word

12  yesterday, last night, that his dad passed away last night.

13  He did not ask me to adjourn the sentencing.  His dad was in

14  Egypt when he passed.  And he suffered a lot, Judge.

15  Obviously, the death of his father had nothing to do with

16  this case.  He was young and had an unexpected heart attack.

17         This man spent, I believe, 22 days in lockup

18  before he was released.  Those 22 days were like an

19  eternity.  He was confined to his home for a year.  He --

20  until this day he still wears the electronic monitoring.

21         Judge, you won't regret it if you impose a period

22  of probation.  He will not let you down.  He's a good

23  person.  I respect the government, and they said that he

24  committed this offense; I agree.  If you buy a home for a

25  hundred thousand and you sell it for 200,000, I guess maybe

1    there's a gray area or fine line whether you're doing it

2    out of greed or you just want to make money or you want to

3    be a billionaire like everybody else wants to be.  But

4    they're right, he wanted to make money.

5            And I've got to tell you, I've got to thank the

6    government for the way they've treated us and for their

7    professionalism and always getting from the beginning of the

8    case the discovery that we were having -- Mr. Trabulus and I

9    were having difficulty getting, but everything that we

10   requested and every time we needed to communicate, I want to

11   thank the government for being fair.

12           And I want the Court to know that not only am I a

13   lawyer, but I'm a mind reader, Judge, and I'm reading the

14   mind of the government that they're not going to lose a

15   minute's sleep if you give a probationary term.

16           And I know Mr. Boulos, Judge, wants to just say a

17   few words to you.

18           THE COURT:  Thank you, Mr. Bruno.

19           First of all, Mr. Boulos, we extend our sympathy

20   on the loss of your father, certainly at this time of year

21   and certainly at this critical moment in your own life.

22           And I will, before I hear from you, I want you to

23   know that, obviously, Mr. Bruno has been in your corner and

24   has advocated for you, and you do have a right to speak to

25   the sentencing judge before I impose sentence.  But I want

PROCEEDINGS                            28

1    you to understand it is not an obligation to speak.  There's

2    no penalty if you do not speak, but if you do wish to speak,

3    now is your opportunity.

4              INTERPRETER SASSI:  He handed me a paper.  Just a

5    line translation, but we have the text.

6              THE COURT:  He has to pronounce it and you can.

7              INTERPRETER SASSI:  Yes, Your Honor.

8              THE COURT:  And I assume it's in Arabic and he can

9    read it in Arabic and you translate for us.

10             DEFENDANT BOULOS:  Your Honor, Judge Vitaliano.

11   My name is Malak Neseem.  I'm standing before you today for

12   several reasons.  First of all, I want you to know, to know

13   how sorry I am for breaking the law.  What I did was wrong

14   and I would like to declare that I am very sorry.  I know

15   you must punish me.  I am willing to accept whatever

16   punishment, whatever punishment you feel you must sentence

17   me to.

18             Your Honor, although I broke the law, I never

19   intended to harm United States or anyone.  I have never

20   stopped thinking about the consequence of my actions.  I

21   came to the United States on 12/12/12.  I apply for asylum

22   in 2013 because I feel allegiance with this country and I

23   would like my kids be grown here because it's a country of

24   safety, far away from the persecution of my country because

25   I suffered and I went through a lot of ordeals for me and my

PROCEEDINGS                    29

1   wife.  We suffered ordeals in my country.  And I never

2   expected that one day I would be accused of a wrongdoing.

3          And I stayed 22 days in the Metropolitan Detention

4   Center.  It was very horrible time for me and my family.

5   I -- then I said I was confined to my home from October,

6   October 20, 2013 to September 2014.  It was so difficult

7   too.  I lost a good job at Lukoil in New Jersey.  That job

8   helped me pay the rent and support my family.

9          I have had plenty of time to think about why I

10  will never break the law again and what can happen to me as

11  a result.  Your Honor, you have to, please, I understood my

12  lesson very well and I will make you proud of me.  I will

13  never deceive you one more time.

14         If the thought was given to me to stay with my

15  family and to continue my work, so my -- would be a

16  disruption and breakdown of my family.  And to be a very

17  productive citizen and I give back to the community in this

18  country, a country that I love since my childhood.

19         And, finally, Your Honor, I would like let you

20  know that I didn't break the law at all during 45 years my

21  life, only the exception of this wrongdoing.

22         And I do thank you, Your Honor.

23         THE COURT:  Thank you, Mr. Boulos.

24         All right.  That brings us to you, Mr. Pitluck.

25  Do you wish to be heard on behalf of the United States?

PROCEEDINGS                                              30

1         MR. PITLUCK:  Very briefly, Judge.

2         This is a case where I would have loved to have

3    stand up before the Court and said Your Honor has our

4    submissions, Your Honor has our position and we don't oppose

5    a downward departure from the guidelines.  Your Honor has

6    seen that we have acknowledged the personal circumstances

7    and the conduct of the defendants while they have been

8    released on bail.  There are certainly no issues with that.

9         However, I feel -- we feel like we were being

10   baited into defending our case, defending our statutory

11   regime, defending the conduct that underlines the guilty

12   pleas here today.  And, Judge, I don't really want to rise

13   to that bait.  I think our letter clearly and accurately

14   lays out the conduct, the seriousness of it.  That fact that

15   it was certainly contemplated before by the defendants and

16   the AMA United before they came into the United States.

17        And that most importantly, Judge, and I don't want

18   to lose the forest through the trees of lengthy sentencing

19   submissions where each email is parsed through to determine

20   and speculate as to what each person thought.  I don't think

21   that's appropriate or necessary here.

22        What I do know is that nobody disputes the fact

23   that the defendants traveled to New York, they had a meeting

24   that was recorded.  They looked at samples for very -- inert

25   samples for very, very dangerous military munitions.  They

1   sat in the back of a car in Rockefeller Center and sent them

2   to Egypt without a license.

3          Now, I would love to engage in the speculative

4   conduct of what was going to happen after these samples were

5   received.  Would there been have a license, would they have

6   gone to the soccer factory?  That, Your Honor, to be, as we

7   said in our letter, to be perfectly frank, is what the

8   licensing process entails.  If that had been completed, we

9   wouldn't have any issues whatsoever.

10         And that's the only point that we wish to make,

11  Judge, is that this was serious conduct that was engaged in

12  the United States.  I've heard both defendants admit to it

13  and acknowledge the wrongness of it.  And, Judge, that's

14  what's important because this is a scheme, a regulatory

15  scheme that is very important to the national security

16  interests of the United States.  And I believe that this

17  prosecution makes it clear how serious we take that.  And it

18  makes clear that this applies to samples because that's the

19  tip of the iceberg, and it makes clear that the United

20  States government and its agencies cannot tolerate this sort

21  of conduct.  And I'd like to leave it at that, Judge.

22         The only thing I would note beyond that, Judge,

23  for the record is I had a chance to read the Groos and

24  Sevilla cases.  Those are cases that involved dual use

25  products being shipped to Iran under a different statutory

1    regime.  Those are what we call IEEPA projects, Congress

2    controlled products.  These are military products.  IEEPA,

3    I'm not going to pronounce the whole statue because at this

4    point, Judge, I'm too sleep deprived to remember it.  But

5    that was -- certainly those cases are on point because they

6    relate to the same sentencing schemes, but those are very

7    different products.  To the extent that they were -- those

8    were dual use water flow items and computer equipment that

9    were governing straight contravention of our policy.

10              So, Judge, with that I would rest on our letter

11   and the position we take in our letter and, obviously,

12   acknowledge, you know, the personal circumstances and

13   background of the defendants as we heard it here today.  And

14   unless the Court has any questions for me, I'll leave it at

15   that.

16              THE COURT:  No.  I think I've waded through this

17   enough to get the facts and the evidence that I need to make

18   a determination.  So I appreciate your offer and consider

19   your words and the government's submission.

20              MR. PITLUCK:  Thank you, Judge.

21              THE COURT:  All right.  That being the case, the

22   Court will follow its normal practice which is to announce

23   its intended sentence, the reasons for it, particularly in a

24   case like this is important to do so.  But I do it for one

25   reason and one reason alone, to the extent that with respect

PROCEEDINGS                          33

1   to any of the three defendants, I verge on an illegal

2   sentence, something that's unlawful, gives counsel an

3   opportunity to point out that unlawfulness and gives me an

4   opportunity to avoid it.  It is not an opportunity to

5   relitigate any of the determinations that I make that all

6   counsel agree that are within my province to make, though

7   they are unhappy with the conclusions I reach.

8           The record will further reflect that though

9   advisory, the Court has fully consulted the guidelines

10  promulgated by the United States Sentencing Commission

11  relevant to this case.  More importantly, the Court has

12  fully considered all of the objectives, standards and goals

13  set forth in Title 18, United States Code, Section 3553(a)

14  which actually controls the imposition of sentence.  The

15  Court has considered the respective PSRs, presentence

16  reports that have been prepared by probation; the addendum

17  that was prepared in the case of Mr. Tawdraus.  The Court

18  has also considered all of the written submissions,

19  including the exhibits that have been submitted in the

20  defense submissions on behalf of Mr. Boulos and

21  Mr. Tawdraus.  The Court has fully considered the letters

22  that were submitted by the government, letter briefs

23  submitted by the government with respect to Mr. Boulos and

24  Mr. Tawdraus; heard the arguments of counsel here at the

25  sentencing hearing and the words of remorse and contrition

PROCEEDINGS                    34

1    that have been offered by Mr. Boulos and Mr. Tawdraus at the

2    sentencing hearing.

3          And this is the Court's intended sentence and the

4    reasons for it.  I'll just briefly address the corporate

5    defendant, the AMA United defendant.  There's not much to be

6    said there.  It is a defunct corporation and existed only in

7    Egypt, consistent only of its three partners, no employees.

8    Other than this incident here in the United States, had

9    really no contact with the United States at any time and,

10   again, does not exist under the guidelines and

11   recommendation of probation, the Court, since we have to

12   close the loop again, it doesn't exist.  So to what point, I

13   don't know but it's required.  The Court intends to impose

14   on that defendant a period of one year's probation and a

15   statutory assessment as required of $400.

16         Now, with respect to the two remaining defendants,

17   Mr. Boulos and Mr. Tawdraus, the Court intends to impose the

18   same sentence with respect to each of those defendants.  And

19   since there is such commonality, I would list both at the

20   same time.  For all of the length and dissimilarity of the

21   briefing supplied by the defense and the government, there's

22   an awful lot of agreement and I want to touch on the

23   agreement first.  And it is the, you know, the principal

24   reason why we are here.  That there is a statute, the

25   statute does deal with the national security of the United

PROCEEDINGS                          35

1   States.  By definition it is important and there is also

2   agreement that the defendants violated that statute with the

3   requisite intent to commit a crime and, therefore, that it

4   is appropriate that there be a punishment for that offense.

5           Now, that having been said, there's a lot of

6   oddities in this case.  There's undercover agents, there's

7   wiretaps, consensual wires I should say.  There was a

8   search, there were Mirandized statements.  The defendants

9   were allowed to, notwithstanding, return to Egypt, the

10  serious threats to the United States, then allowed to come

11  back into the United States.  And in the case of Mr. Boulos,

12  he gives us a wonderful timeline by referencing the fact

13  that he entered the United States on December 12th of the

14  year 2012, 12/12/12, not arrested until October of 2013 for

15  something that happened in 2011.

16          The case seems to -- to that extent, while there's

17  so much commonality, there's also, to some extent there's

18  like a Rubik's Cube given -- and what Mr. Pitluck didn't

19  mention in his oral presentation for the Court.  And this is

20  where the Rubik's Cube comes in is that in the written

21  submissions that he did reference, there is a clear request,

22  even though there is two-level global departure and an

23  acknowledgement by the government that even after adjustment

24  for the global variance, that the Court should sentence

25  nonetheless below, further below the guideline that's

PROCEEDINGS                                    36

1    adopted as the applicable guideline in this case.  But the

2    written submission also requests that the Court impose a

3    period of additional incarceration.  That's where the case

4    seems to me begins to break down substantially.

5           This is a case, to some extent, that suffers from

6    headline bias.  The word "arms" is in the case and the words

7    "Middle East" is in the case.  So it is headline bias.  This

8    case would be no different.  There is no geopolitical

9    significance to this case.  The case would be the same if

10   the munitions factory were located in Dublin or in Rome or

11   in Ottawa or in London.  It matters not.

12          Now, what's at issue here is a substantial

13   regulation.  A regulation that was breached.  Mr. Bruno

14   shied away from the word "breached" because of greed.  You

15   know, the difference between making money selling a house

16   and greed.  There's no greed in making a profit unless

17   you're gouging in a regular commercial deal.  But

18   notwithstanding anything else, there is greed when you break

19   the law to make money.  And that's what Mr. Boulos and

20   Mr. Tawdraus did.  This is like the guy with a contract with

21   the government where it calls for one-and-three-quarter-inch

22   plywood and they provide one-and-five-eighths-inch plywood

23   to save a few bucks thinking it doesn't matter.  And what's

24   the doesn't matter part about this case?  And the government

25   calls it speculation.

PROCEEDINGS                    37

1        Well, the government's comments about speculation

2   is what is the speculation.  There is absolutely nothing in

3   this case, not a scintilla of evidence in this case to

4   suggest what the defendants said they intended to do was, in

5   fact, exactly what they intended to do.  They told the

6   undercovers it, they told the government after they -- when

7   they were first spoken to, they said it after they were

8   arrested, they said it in their letters and they said it

9   again today.  The objective was to engage in a contract that

10  was to be fully compliant not only with the law of the

11  United States, but with the law of Egypt.

12        Impressive in the papers is the statement that,

13  and we have two law abiding -- there's absolutely, again,

14  not a scintilla of evidence that these guys even got a

15  jaywalking ticket.  That they wanted to make sure that even

16  the sample, the samples that they were sending would go

17  directly to the munitions factory because if they went

18  anywhere else, it would have violated Egyptian law,

19  substantive law, the possession.  So you see the regulation

20  here that appears to be a paperwork regulation with respect

21  to samples, that's the corner is cut.  It's violated, but

22  with the full understanding that if, in fact, the samples

23  produced a contract, that the contract would be fully

24  compliant with American law and would have been a contract

25  between presumably a licensed exporter here in the United

PROCEEDINGS                    38

1    States with a munitions factory run by the government of

2    Egypt which during that period of time it was a little

3    interregnum period after the fall of Hosni Mubarak.  But

4    during a period of time where the Egyptian Army, which had

5    supported Mubarak and his predecessors and had been an ally

6    of the United States since the Middle East wars of the

7    1960s, an important ally of the United States in the Middle

8    East, would be putting together one ally with another ally

9    with fully licensed agreement between the two.  That was the

10   intent.

11           So what do we have?  I think it reads on who they

12   are, what their character is, what their objective was.  It

13   plays into a guideline that is ridiculously useless.  It

14   would have treated this almost like it was a bazooka, a

15   fully loaded bazooka or rocket launcher that could have

16   knocked down a plane, treated the same way as an inert

17   munitions.

18           The fact that the top of the guideline was three

19   months under the maximum sentence under the statute, and it

20   would have been the same no matter what, underscores how

21   ridiculous the guideline is.  But there's an offense.  At

22   the same time there's an offense and it is what Mr. Pitluck

23   tells us is that this is an important regulation because it

24   gives the United States control.  That's what, that's what

25   the corner cutting was all about.  It took away the

PROCEEDINGS                        39

1    opportunity of those agencies of the United States

2    government responsible for the international relationships

3    that exist between the United States at any level,

4    commercial, military or otherwise, with foreign governments

5    and agencies of those governments or commercial enterprises

6    of those governments, it took away the ability of the

7    government of the United States, which by its regulation

8    made a flat statement that it wants to be involved in those

9    determinations, took that away from the government and

10   usurped it to themselves.  Why?  To make money.

11         This is a case about defying regulations to make

12   money.  It's not a terrorism case.  Nothing was happening

13   here that would directly impact military relations or the

14   ability of the Egyptian military to do something that the

15   government of the United States didn't want.  I am convinced

16   that what the defendants say is true, that that deal would

17   not have occurred unless it was fully lawful and licensed in

18   both countries.

19         So how do we punish an economic crime that has

20   serious national security overtones?  The problem with the

21   government's argument for incarceration is that the best

22   argument is usually the worst argument from a sentencing

23   judge's perspective, and that's the argument of general

24   deterrence.  I don't need to deter AMA.  It doesn't exist.

25   No need to deter Mr. Boulos and Mr. Tawdraus even now from

PROCEEDINGS                              40

1    corner cutting.  I think they understand that regulatory

2    regimes are important.  The rest of their lives are what

3    they seem to be an open book and they seem to be very -- men

4    of character, God fearing and law abiding.  And I don't

5    think there's much concern for the need for specific

6    deterrence.

7            There's a need to punish, there's a need to

8    promote respect for the law.  And it seems to me that and we

9    recognize the difficult financial circumstances the

10   individual defendants are in.  They're in a new country.

11   They're hamstrung by their -- the fact that they've been

12   involved in this case at all has been a punishment in the

13   case of Mr. Boulos that that punishment, that punishment

14   effects his family.  It's a legitimate concern here.  Though

15   he obviously seems to be well supported by the Coptic

16   Christian community in New Jersey and his church.  His wife

17   and his two small children are basically here alone.  He's

18   the breadwinner and that is his inability to continue to

19   work would be a severe handicap to that family.

20           In the case of Mr. Tawdraus, he's even in worst

21   shape to some extent.  He's alone.  Any kind of

22   incarceration would be harsher on him than most defendants

23   so the Court is aware of that as well.

24           So it is with respect to the two defendants,

25   Mr. Boulos and Mr. Tawdraus, it's the intended sentence of

PROCEEDINGS                    41

1    the Court to impose a period of three years' probation.  The

2    Court recognizing the fact that this was economic, an

3    economic crime, intends to punish the defendants

4    economically and impose on each a fine of $2,500 in addition

5    to the special statutory assessment on each of $100.

6             There was mention made in the presentence

7    report -- I don't see it anywhere else -- that there might

8    be some forfeiture involved, but I can't imagine what that

9    forfeiture is.

10            MR. PITLUCK:  I don't believe there's forfeiture

11   in this case, Judge, or restitution in this case.

12            THE COURT:  Certainly no restitution, but no one

13   has identified, though it's been mentioned, we can't find

14   anything that would be forfeited so there will be no

15   forfeiture.  The Court does impose, in addition, and it's

16   more not out of fear of them violating, but for purposes of

17   punishment, the Court is also going to impose as a condition

18   of probation six months of home confinement which will

19   certainly allow the defendants to continue to work and to,

20   among other things, attend religious observance.

21            The deputy clerk will read into the record the

22   other intended conditions of probation.

23            COURTROOM DEPUTY:  The special conditions for

24   Defendant Boulos.  For a period of six months the defendant

25   shall remain in his place of residence.  The defendant is

PROCEEDINGS                              42

1    only authorized to leave for employment or other necessary

2    activities with the approval, in advance, of the U.S.

3    Probation Department.

4           The home detention period shall commence on a date

5    determined by the Probation Department.  While serving the

6    period of home detention, the defendant shall wear

7    electronic monitoring bracelet and shall abide by all

8    technology requirements.  The defendant shall pay the costs

9    of home detention to the degree he is reasonably able.  The

10   defendant shall disclose all financial information and

11   documents to the Probation Department to assess his ability

12   to pay.  The defendant shall make full financial disclosure

13   to the probation officer.  The defendant shall not possess a

14   firearm, munition or destructive device.  And if deported,

15   the defendant shall cooperate and abide by all instructions

16   of immigration authorities and may not reenter the United

17   States illegally.

18          For the Defendant Tawdraus.  For the period of six

19   months, the defendant shall remain in his place of

20   residence.  The defendant is only authorized to leave for

21   employment or other necessary activity in approval in

22   advance of the U.S. Probation Department.  The home

23   detention period shall commence on a date determined by the

24   Probation Department.  While serving the period of home

25   detention, the defendant share wear electronic monitoring

PROCEEDINGS                    43

1  bracelet and shall abide by all technology requirements.

2  The defendant shall pay the cost of home detention to the

3  degree he is reasonably able.  The defendant shall disclose

4  all financial information and documents to the Probation

5  Department to assess his ability to pay.  Upon request, the

6  defendant shall provide the U.S. Probation Department with

7  full disclosure of his financial records including

8  commingled income, expenses, assets and liabilities to

9  include yearly income tax returns.  With the exception of

10  the financial accounts reported and noted within the

11  Presentence Report, the defendant is prohibited from

12  maintaining and/or opening any additional individual and/or

13  joint checking, savings or other financial accounts for

14  either personal or business purposes without the knowledge

15  and approval of the U.S. Probation Department.

16       The defendant shall cooperate with the probation

17  officer in the investigation of his financial dealings and

18  shall provide truthful monthly statements of his income and

19  expenses.  The defendant shall cooperate in the signing of

20  any necessary authorization to release information forms

21  permitting the U.S. Probation Department access to his

22  financial information and records.

23       The defendant shall not possess a firearm,

24  ammunition or destructive device.  And, if deported, the

25  defendant shall cooperate with and abide with all

PROCEEDINGS                      44

1    instructions of immigration authorities and may not reenter

2    the United States illegally.

3            THE COURT:  Now, with respect to the fine.  The

4    fine is due and payable immediately and at 10 percent of

5    gross income per month during the period of probation.

6            Does any side take exception or legal objection to

7    the intended sentence as announced?

8            MR. TRABULUS:  No.

9            MR. BRUNO:  No, Judge.

10           MR. PITLUCK:  Judge, the only request we would

11   make is for the corporate defendant, I believe it was in the

12   Presentence Report as part of the plea agreement, that they,

13   the corporate defendant, AMA United, would agree to be on

14   lists related to the Department of Treasury.  And I believe

15   if the Court is inclined, even though it is a defunct

16   organization, that it is important for regulatory reasons we

17   would ask for that condition to be imposed.

18           THE COURT:  I think that was supposed to be read

19   as a condition of the probation.

20           COURTROOM DEPUTY:  Give me one second and I will

21   do that.

22           THE COURT:  That was a probation condition.

23           MR. PITLUCK:  Okay.  Yeah, that's fine.

24           COURTROOM DEPUTY:  For AMA United Group these are

25   the following conditions:  The defendant shall cooperate

PROCEEDINGS                          45

1   with and abide by all instructions of the United States

2   Department of Commerce, United States Department of State

3   and/or the United States Department of the Treasury.

4           MR. PITLUCK:  The only other thing, Judge, is

5   there was an underlying indictment.  I would move to

6   dismiss that at this point.

7           THE COURT:  All right.  We will.  Let me advise --

8           MR. PITLUCK:  Oh, sorry, Judge.

9           THE COURT:  We'll get there.

10          MR. PITLUCK:  Sometimes I forget so I want to make

11  sure I got it.

12          THE COURT:  I try to remember.  We'll bring you

13  all back if we forgot.

14          In any event, there is an appellate waiver or at

15  least with respect to the human defendants I believe in the

16  plea agreement.  So the defendants are advised that you have

17  a right to appeal your conviction and sentence.  If you

18  believe your guilty plea was involuntary, if there was some

19  other fundamental defect in it, you have a right to appeal

20  the sentence if you believe that it is contrary to law.

21  However, you have entered into a plea agreement which

22  contains an appellate waiver giving up those rights.  Those

23  appellate waivers are generally enforceable.

24          If you believe, however, that your waiver is not

25  enforceable, you are free to present that argument to an

PROCEEDINGS                                46

1    appropriate appellate court.  Please take further notice

2    that ordinarily any notice of appeal must be filed within

3    14 days of the entry in the clerk's office of the order or

4    judgment to be appealed.

5              And if you cannot afford to and you want to

6    appeal, cannot afford to, file a written notice.  Please

7    advise the Clerk of Court and the Clerk of Court will

8    prepare and file a notice of appeal at your request.

9              Now, Mr. Pitluck, are there any --

10             MR. PITLUCK:  Yes, Your Honor.  The government

11   would move to dismiss the underlying indictment in this

12   case.

13             THE COURT:  All right.  The underlying indictments

14   in this case are dismissed.  The intended sentence is

15   imposed, of course, on the basis of the reasons that were

16   stated for the intended sentence.  Those reasons are

17   incorporated and adopted as the reasons for the sentences

18   imposed.

19             Is there anything further we need to attend to?

20             MR. PITLUCK:  Not from the government, Judge.

21             MR. TRABULUS:  Just one thing, Your Honor.  And

22   I'm CJA on the case and I would just ask for a transcript of

23   this under the Criminal Justice Act.  It's not going to be

24   for an appeal.  To me that's inconceivable.  I hope to

25   present it to his immigration lawyer and it to be presented

PROCEEDINGS                               47

1    to the immigration judge on his asylum application.

2          THE COURT:  I would certainly grant your request for

3    that order.  And to you as well, Mr. Bruno.

4          MR. BRUNO:  Appreciate that.

5          THE COURT:  If you need it.

6          MR. BRUNO:  Yes, we do as well.

7          THE COURT:  Anything else?

8          MR. TRABULUS:  Nothing further, Your Honor.

9          THE COURT:  All right, gentlemen.  Much good luck to

10   you.  I know you've learned your lesson.  It's a hard lesson

11   to learn, but it's an important lesson and not only for you,

12   but for those who observe and find how important it is, how

13   important these regulations are to the Government of the

14   United States.

15         Good luck to you and your families.

16         Merry Christmas to you and happy holidays to all.

17         MR. PITLUCK:  Thank you, Judge.

18         (Proceedings adjourned.)

19

20

21

22

23

24

25